MISC 18-3304

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

WEINSTEIN, J.

In re *Ex Parte* Application of SHIRA ISRAELLA KLEIN-BENTSUR for an Order to Conduct Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782,

Petitioner.

Misc. Case No. M-__________

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 12 2018 ★
BROOKLYN OFFICE

**DECLARATION OF SHIRA ISRAELLA KLEIN-BENTSUR IN SUPPORT OF *EX PARTE*APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

I Shira Israella Klein-Bentsur declare, under penalty of penury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. The facts set forth herein are based on my personal knowledge, unless otherwise indicated. I respectfully submit this Declaration in support of my application for discovery in aid of foreign proceedings under 28 U.S.C. § 1782. If called as a witness, I could and would testify to the same as stated herein.

**Introduction**

2. I am an Israeli and United States citizen that is currently involved in divorce, alimony, and child support proceedings in Israel. In the events leading up to that divorce, my husband made a variety of representations about our net worth. After a financial investigation and going through those proceedings, it became apparent that my husband lied about our holdings: both to me and the Israeli Court. It also became apparent that my husband has been transferring those assets in secret. In the Israeli proceeding, after

considering my husband's illicit conduct, the Court ordered a Mareva injunction that froze my husband's assets outside of Israel, ordered temporary injunctions on my husband's assets in Israel, and imposed a litigation hold on third parties who had possession, custody, or control of documents that related to my husband's assets. A true and correct copy of this Mareva injunction is attached hereto as **Exhibit A**.

3. I am bringing this application to discover information and documents concerning my husband's assets.

**Background**

4. Ron Bentsur and I were married on June 9, 1999, and we have three children, Amit, Nadav, and Eylon. All three kids have special needs, including Nadav, who has autism.

5. Shortly after our first son was born, we made the decision that Ron would work and I would take care of the children and the house. To accommodate our agreement, I gave up my career at Shrem, Fudim, Kelner Investment house.

6. Ron took a job as the Chief Financial Officer at Keryx Biopharmaceuticals Inc. ("Keryx"). To accommodate this choice, the family moved from Israel to Tenafly, New Jersey. Ron ultimately became the CEO of Keryx, and guided it through an IPO. Ron remained Keryx's CEO until May 2015.

7. During this time, Ron also became the CEO of another biomedical company, called XTL Biopharmaceuticals Ltd. ("XTL") Ron held that position from 2006 until 2009.

8.  Ron also was involved in various investments and projects at the time, realizing enormous sums of money. During this time, Ron established the reputation as one of the most talented managers in the biomedical field. He has served on boards of numerous companies and has been financially successful. As further detailed below, I did not know how successful until my divorce proceedings started.

9.  Despite Ron's career success, and my attempts to support Ron, we grew apart. Ron has issues controlling his temper, which created serious problems in our relationship. With time, Ron became more and more emotionally abusive, both towards me and our children.

10. In 2014, we made the decision to return to Israel. I returned first, with our three children, while Ron stayed in New Jersey with the intent of rejoining us upon the termination of his contract with Keryx at the end of the year.  He also purported to use this time alone in New Jersey to continue his abusiveness and anxieties therapy. However, when Ron came back in 2015, it appeared that his emotional issues and behavior were not sufficiently addressed. As such, and as recommended by our family therapist, Ron moved into a separate dwelling with the hope that he would spend time working on his temper and other issues, and slowly integrate back into family life. This did not work.

11. Despite various attempts to fix our marriage, which included mediation and counseling, we were unable to reconcile and commenced a child support action in Israeli Family Court.  We hoped to settle this matter quickly through mediation and settlement negotiations.  During our negotiations, and without giving me notice, Ron commenced a

separate divorce and alimony matter in Rabbinical Court by filing a statement of claims that included, *inter alia*, false declarations about the parties' financial positions.

12. Our dispute soon turned contentious. Ron refused to pay alimony to me or child support for our three children and in addition, started to empty our bank accounts.

13. Under Israeli law, I believe that I am entitled to 75% of the marital assets. That is the amount I am seeking in the Israeli civil action.

**Ron Understates Marital Assets in Israeli Proceedings**

14. When Ron and I began negotiating our separation, Ron would only admit to assets that I knew about. During our divorce negotiations and divorce proceedings, Ron was supposed to disclose all assets. He did not. Instead, he continued to try to drag out negotiations and then proceedings in the Rabbinical Court. It turns out that Ron drew out these proceedings to dispose of assets, as further detailed below.

15. Ron disclosed the following assets:

    a.  Our house in Tenafly, New Jersey.

    b.  A Merrill Lynch account worth about $2 million.

    c.  An Oppenheimer & Co. account worth about $1.9 million.

    d.  An investment in a private fund managed by Mr. Alon Even worth about $1.8 million.

    e.  An investment in the MYGSTONE SAI Fund worth about $1 million.

    f.  A JPMorgan Chase & Co. ("JPMorgan") account worth about $1 million.

g. An investment in a New Jersey Real estate fund managed by Mr. Dan Kaplan worth about $500,000.

h. A TD Bank, N.A. ("TD Bank") account worth about $400,000.

i. A First Trade Union Bank account worth about $100,000.

j. A Wells Fargo account worth about $2,500.

k. A Bank Hapoalim account worth about 400,000 Israeli Shekel ("NIS").

l. A second Bank Hapoalim account (number 396439).

m. A Bank Leumi account (number 3803374418).

n. An unidentified "bank account in Europe which was opened many years ago."

16. Ron did not realize that I had possession of certain documents that demonstrated assets that Ron had been concealing from me. Both on my own and with the help of professionals, I conducted an investigation into other assets. I found that Ron had been transferring assets by diverting money to his relatives, secretly opening and closing accounts and transferring funds to various bank accounts in various jurisdictions. Likewise, Ron used our money to purchase three very expensive apartments in Israel, one of which housed his mistress. None of this was included in Ron's statement of his assets.

**Assets Hidden by Ron**

17. The examination done for me showed that Ron had at least the other following bank accounts worth about $22 million:

a. An account at JPMorgan worth about $5.02 million;

b. An account at Bank Leumi (England) worth about £2.9 million (~$3.8 million);

c. An account at Mizrahi Tefahot Bank Ltd. (Israel) worth about $2 million;

d.  An account at UBS AG (USA) worth about $2.7 million;

e.  An account at ASB Bank (New Zealand) worth about $1.7 million;

f.  An account at RBC Capital Markets ("RBC") (Bahamas) worth about $1.2 million;

g.  An account at RBC (USA) worth about $1 million;

h.  An account at ABN AMRO Securities LLC worth about $1 million;

i.  An account at Bank Leumi (USA) worth about $815,000;

j.  An account at HSBC Bank plc worth about $650,000;

k.  An account at Bank of New York Mellon worth about $530,000;

l.  An account at Wells Fargo worth about $436,000;

m.  An account at Bank of Ireland (UK) worth about €300,000 (~$340,660);

n.  An account at Santander Bank, N.A. worth about $200,000; and

o.  An account at RBC (Japan) worth about ¥ 63 million (~$553,124)

18. Ron's actions also showed a great deal of underhanded behavior. For example, the account at Bank Leumi (England) was registered under the name of the Jerusalem Fund, but the sole signatory was Ron, and his passport was used to open the account.

19. We were also able to find out that Ron was moving money in other ways. Many of the holdings identified in paragraph 15 above came from this Wells Fargo account. Keryx's IPO generated over $15 million for Ron, and that money was placed into the Wells Fargo account. In early 2015, at the time of Keryx's IPO, the Wells Fargo bank account had a $20.7 million account balance. During 2015, Ron transferred at least $3.76 million to unknown accounts at TD Bank, N.A.

20. Ron unilaterally and secretly withdrew money that we invested in a real estate fund known as Even Chen. Mr. Alon Even-Chen advised me that Ron withdrew $1.8 million dollars from that investment without my knowledge (1.16 million at first, followed by an additional $700,000 withdrawal). Ron was required to get my approval for such transfers, and he did not.

**Ron Diverted Money to a Mistress and His Family**

21. During our financial investigation, I learned that Ron had purchased two very luxurious apartments worth approximately $2.5 million. One of these apartments was purchased for a mistress. It turns out that Ron was having an affair during our marriage. In addition to paying for this woman's apartment out of our money, Ron supported this woman and paid for vacations, meals, etc. When Ron submitted his statement of defense to the Israeli Family Court, he actually admitted that three luxurious apartments which were bought by him were not mentioned in his previous material assets affidavits.

22. Ron transferred other money to his family members, including his brothers Eyal Bentsur and Dan Bentsur. Additionally, the second apartment purchased by Ron was for his brother Dan; Dan, his girlfriend, and children are living in that apartment.

**Ron's Additional Misrepresentations about Earnings**

23. Much of the money made by Ron during our marriage was made in the United States. As part of our negotiations, I tried to obtain copies of these tax returns. I believed that they would show that Ron made more money than he was admitting to having.

24. Ron refused to provide our U.S. tax filings, even though these were joint filings. Indeed, Ron instructed our accountant to refuse to send me copies of my U.S. tax filings. I had to address our accountant in person in order to obtain possession of part of these filings. It was found out that in order to hide from me the income he was making, Ron hid the returns from me and forged my signature on those returns. I only understood this once I saw some of the returns; I did not sign any of our tax returns, did not see them before conducting my investigation, and the signature under my name is not mine.

25. I am still trying to obtain various tax filings made on our behalf as part of my proceedings in Israel. However, from what I have seen so far, even though the tax filings show more money than Ron disclosed, I believe that the filings might be inaccurate.

26. Ron served for many years as a director of public companies Stemline Therapeutics, Inc. ("Stemline"), XTL, and Advanced Inhalation Therapies AIT Ltd. ("AIT"), which each pay him a significant salary each year both in money and stock options. He has not disclosed that income. Ron serves as CEO and board member of Urogen Pharma Ltd. ("Urogen"). He also received shares and options in Urogen.

27. Ron also owns property in New Jersey and Tel Aviv.

28. Ron has had an interest in the following entities and has received income that he has not disclosed from the following entities: AIT, XTL, Nextgen Healthcare Information Systems, LLC, E-QURE Corp., Amnalon LLC, Stemline, PROSENESTAR LLC ("PROSENESTAR"), MIG IRC LLC, and Israel Biotech Fund.

**Further Proceedings in Israel**

29. In October 2017, when I was on vacation in Thailand with our children, Ron emptied our joint accounts with Bank Hapoalim, JPMorgan, and TD Bank. For example Ron tried to withdraw NIS 300,000 (~$81,808) from Bank Hapoalim; once that was blocked, he made several smaller withdrawals of about NIS 50,000 each (~$13,634). Likewise, Ron made several transfers out of our TD Bank, totaling about $500,000. This came as Ron continued to threaten me that he would leave me without money to care for myself and our three children, all of whom have special needs. After Ron had threatened me and I understood that he is going to empty all our bank accounts in order to unlawfully force me to settle, I withdrew approximately $500,000 in order to have some funds both for my children and for myself until the end of the divorce actions.

30. Also in October 2017, Ron stopped having his salary, compensation as a director, and investment income, deposited in our joint accounts.  Only scarcely does he deposit small amounts in order to close some deficits in our mutual bank account.

31. Earlier this year, we presented this evidence to the Rabbinical Court in Israel. Because of Ron's behavior, I sought a Mareva Injunction to freeze his assets outside of Israel and a temporary injunction to freeze his assets in Israel. The Israeli Court granted both applications.  However, the Israeli banks and financial institutions informed us they were unable to locate almost no assets belonging to my husband in Israel. Regarding the Mareva Injunction, we still do not know exactly what assets Ron has or where they are located, making it impossible to enforce this application and ensure my husband is not dissipating those assets.

32. In order to protect my rights, I intend to continue to prosecute my claim against Ron in Israel, and enforce my rights in other courts if I need to protect and uncover assets. This money is necessary to support myself and our three children, who will require help for the rest of their lives.

**Discovery Sought**

33. I have filed this application under 28 U.S.C. § 1782 to obtain discovery from the companies affiliated with my husband, PROSENESTAR and AIT, in aid of the divorce, alimony, and child support proceedings currently pending in Rabbinical Court in Israel.

34. Each of PROSENESTAR and AIT resides or is found in this district, according to their websites, regulatory filings, and/or the New York State Department of State website. PROSENESTAR is located at 7014 13th Avenue, Suite 2002, Brooklyn, New York 11228. AIT is located at 825 East Gate Boulevard, Suite 320, Garden City, NY 11530.

35. I intend to seek discovery to determine (1) what assets Ron has, and (2) how, when, and to whom Ron has transferred assets.

Dated: December 7, 2018

Shira Israella Klein-Bentsur

4845-1950-1441.1

**בבית הדין הרבני האזורי**
**<u>בתל אביב</u>**

**תיק 1163881/1**
**בפני הרב עמרני, אב"ד הרב כהן, הרב בן מנחם**

**גב' ישראלה שירה קליין בנצור, ת.ז. 023570674**
מרחוב מגדל שורשן 12א', תל אביב

על ידי באי כוחה עוה"ד ספי ריבה ו/או עורכי דין אחרים
ממשרד סורוקר אגמון נורדמן, עריכת דין ועריכת פטנטים
שמענם לצורך מסירת כתבי בי-דין הוא:
רח' החושלים 8, ת.ד. 12425, הרצליה 4672408
טל: 09-9507000; פקס: 09-9505500
דואר אלקטרוני: office@ip-law.legal

וכן

עוה"ד לורי גייזלר ו/או עורכי דין אחרים
ממשרד גייזלר עורכי דין
שמענם לצורך מסירת כתבי בי-דין הוא:
רח' בר כוכבא 23, בני ברק
טל: 073-7051480; פקס: 03-5224722
דואר אלקטרוני: lori@geizler.co.il

**<u>המבקשת</u>**

**- נ ג ד -**

**רון בנצור, ת.ז. 059711432**
מרחוב גנים 20, רמת השרון

**<u>המשיב</u>**

1. **Keryx Biopharmaceuticals Inc.**
One Marina Park Drive Boston, MA 02210, USA
2. **Urogen Inc.**
499 Park Avenue, Suite 120, NYC, NY 10022, USA
3. **Advance Inhalation Therapies LLC.**
500 Mamaroneck Avenue, Suite 320, Harrison, NYC, NY, USA
4. **נקסט ג'ן ביומד**
עזריאלי, המגדל העגול (קומה 22), תל אביב, ישראל
5. **XTL Biopharmaceuticals LLC**
רחוב החרושת 5, רעננה, ישראל
6. **E-OURE Corp.**
20 West 64th street – Suite 39G, Nyc, NY 10023, USA
7. **Amnalon LLC**
212 Highwood Avenue, Tenafly, NJ 07670, USA
8. **Stemline Therapeutics, Inc.**
1675 York Avenue, Suite 30-E, Nyc, NY 10128, USA
9. **PROSENESTAR LLC**
7014 13th Avenue, Suite 202, Brooklyn, New York, 11228, USA

**<u>המחזיקות 1-9</u>**

10. **MIG IRC LLC.**
20 Calais Road, Mendham, NJ 07945, USA
11. **Dan Kaplan's Fund.**
רחוב שילה 7, תל אביב, ישראל
12. **אלון אבן חן**
הדקל 23, הרצליה, ישראל

**<u>המחזיקים 10-12</u>**

13. Citibank N.A
14. HSBC Bank plc
15. First Direct
16. JP Morgan Chase & Co
17. TD Bank
18. Bank Leumi (אנגליה)
19. Bank Leumi (ארה"ב)
20. Merrill Lynch
21. Wells Fargo
22. Oppenheimer & Co Inc
23. UBS Investment Bank (ארה"ב)
24. ASB Bank (ניו-זילנד)
25. RBC Capital Market (בהאמס)
26. RBC Capital Market (ארה"ב)
27. RBC Capital Market (יפן)
28. ABN AMRO Securities LLC (ארה"ב)
29. BNY Mellon (ארה"ב)
30. Bank of Ireland
31. Santander Bank (ארה"ב)

**מחזיקים 13-31**

32. קרן ירושלים

**המחזיקה 32**

# בקשה להגבלת שימוש בנכסים

[במעמד צד אחד]

**בית הדין הנכבד מתבקש לעשות שימוש בסמכות הנתונה לו מכוח תקנות ק"ח וק"ט לתקנות הדיון בבתי-הדין הרבניים בישראל, התשנ"ג (להלן: "התקנות") ולהורות על הטלת צו להגבלת שימוש בנכסים, במעמד צד אחד, על כל נכסי המשיב, מר רון בנצור, לרבות הגבלת שימוש בכספי מר בנצור המצויים בחשבונותיו והגבלת השימוש בכל זכות אחרת של המשיב המוחזקת אצל המחזיקים, ובתוך כך להורות למר בנצור בעצמו ו/או באמצעות מי מטעמו, להימנע מלעשות כל פעולה בנכסיו המצויים מחוץ לתחום שיפוטו של בית הדין הנכבד, ובכלל זה להימנע מהוצאת נכסי החוץ, כולם או חלקם, מרשותו או מרשות מחזיק מטעמו, להעביר, למכור, לשעבד, למשכן או לשנות את מצבם של נכסי החוץ, כולם או חלקם, או את זכויותיו בנכסי החוץ או מלעשות בהם כל דיספוזיציה; והכול - להבטחת ביצוע פסק הדין שינתן (לכשינתן) בתובענה הכספית-רכושית המוגשת על ידי המבקשת בד בבד עם הגשת בקשה זו.**

לחילופין ולמען הזהירות בלבד, יתבקש בית הדין הנכבד להעניק למבקשת כל סעד אחר אשר יראה בעיניו כנכון וצודק בנסיבות העניין.

<u>ואלה הנכסים והזכויות אשר הגבלת השימוש בהם מתבקשת</u> (לעיל ולהלן: "נכסי החוץ"):

א. כל הכספים ו/או הזכויות הכספיות מכל מין וסוג שהוא ו/או שטרי חוב ו/או הזכויות העומדות ו/או שתעמודנה לזכות המשיב בחברות ו/או בתאגידים הביטוחיים ו/או במוסדות הפיננסיים ו/או בקרנות ו/או אצל הצדדים המנויים לעיל כמחזיקים.

ב. כל זכויות המשיב במניות החברות: Keryx Biopharmaceuticals Inc. (המחזיקה 1), Urogen Inc. (המחזיקה 2), Advance Inhalation Therapies LLC. (המחזיקה 3), נקסט ג'ן ביומד (המחזיקה 4), Biopharmaceuticals LLC (מחזיקה 5), E-OURE Corp. (המחזיקה 6), Amnalon LLC (המחזיקה 7),

MIG IRC LLC ;(המחזיקה 9) Prosenestar LLC ,(המחזיקה 8) Stemline Therapeutics, Inc. (המחזיקה 10); ו- Dan Kaplan's Fund (המחזיקה 11).

## <u>ואלה נימוקי הבקשה:</u>

## <u>א. מבוא</u>

1. **עניינה של בקשה זו - צו המגביל את המשיב לעשות שימוש בנכסי בני הזוג המצויים מחוץ לתחום שיפוטו של בית הדין - נועדה <u>לשמר</u> את כל נכסי בני הזוג <u>במצבם הקיים</u>, לרבות כספים המצויים בחשבונות הבנק של המשיב וכל זכות אחרת של המשיב המוחזקת בידי המחזיקים בהיותם: (א) חברות בהן כיהן ו/או מכהן המשיב כמנכ"ל ו/או דירקטור ו/או כבעל מניות (המחזיקות 1-9) (ב) חברות ו/או גופים ו/או נאמנים ו/או יועצי השקעות האמונים ו/או קשורים לניהול נכסיו והכנסותיו של המשיב, לרבות ביצוע השקעות עבורו (המחזיקים 10-12); (ג) מוסדות פיננסיים שונים בהם המשיב מחזיק בכספים רבים אותם העביר, בין היתר, מחשבונותיהם המשותפים של בני הזוג (המחזיקים 13-31); (ד) חברה הרשומה כבעלת חשבון בבנק לאומי - אנגליה בו מוחזקים מיליוני ליש"ט, אשר זכויות החתימה והזכויות בו רשומות אך ורק על שם המשיב אחר שנרשם בספרי הבנק באמצעות דרכונו הישראלי כ'רונלד בנצור' (המחזיקה 32).**

2. המבקשת, גב' ישראלה בנצור (להלן גם: **"ישראלה"**) זקוקה למתן צו איסור השימוש האמור על מנת שתעמוד לרשותה האפשרות לממש את זכותה לקבלת חלקה בנכסים, כספים וזכויות שצברו בני הזוג טרם פרידתם אך הוכמנו בתחכום ובנכלוליות על ידי המשיב (להלן גם: "רון")

3. ודוק; כפי שיובהר להלן בקצרה ומפורט בהרחבה בבקשות לסעדים זמניים המוגשות בד-בבד עם הגשת בקשה זו, רון - **מבכירי ומובילי תעשיית הביומד, המפיק רווחי עתק בניהול חברות ציבוריות בארץ ובארה"ב (לרבות על דרך כהונה כמנכ"ל ו/או דירקטור), הוליך את המבקשת שולל, עת פעל בדרכים עקלקלות ובאופן מתוחכם במיוחד הסתיר חלקים נכבדים ממצבת הנכסים האמיתית של בני הזוג, לרבות על דרך פתיחת חשבונות בנק מסווים ומוכמנים אשר פוזרו ברחבי הגלובוס, אליהם הועברו חלק מכספי בני הזוג.**

4. בהתאם, נכון למועד הגשת בקשה זו וכמפורט להלן, רון מחזיק בזכויות מזכויות שונות ובנכסים שונים מחוץ לגבולות ישראל. אשר על כן, אם וככל ולא יינתן צו איסור השימוש, יהא באפשרות רון לפעול להברחת נכסים כאמור באופן אשר יקשה על ישראלה עד מאוד (אם לא למעלה מכך) לממש את זכויותיה.

5. ויודגש - במסגרת הכמנה סדרתית זו, בחר רון **להשמיט** גם מתביעת הגירושין אשר הוגשה על ידיו לבית הדין הרבני (תוך הפרת הסכמת הצדדים בדבר הסמכות הדיונית) חלק ארי מהנכסים ו/או הכספים ו/או הזכויות שנצברו בפועל על ידי בני הזוג וזאת במטרה לגרוע ולכרסם מזכויות המבקשת לחלקים מהרכוש המשותף.

6. כך לדוגמא, לאחרונה נודע לישראלה כי בסמוך להגשת תביעת הגירושין על ידי רון, <u>**רכש רון בהיחבא 2 דירות יוקרתיות ברמת השרון(!) ששווין מיליוני שקלים (!)**</u> והכול תוך הסתרת דבר רכישת הדירות האמורות מישראלה, כמו גם תוך השמטת עובדת קיומן של הדירות האמורות מתביעת הגירושין הכרוכה אשר הוגשה על ידי רון לבית הדין הנכבד.

7. בנסיבות אלו ברור למבקשת, כי חרף הסתייעותה באנשי מקצוע וחקירה כלכלית מעמיקה אותה ערכה, עלה בידיה לאתר **רק חלק** מהיקף הכספים שהוכמן על ידי רון; זאת בעוד נוכח התנהלותו קיים יותר מחשש סביר כי ישנם נכסים וכספים נוספים שהוכמנו וטרם אותרו על ידי המבקשת נכון למועד הגשת בקשה זו.

8. בהתאם, נוכח היקף ההסתרה וההברחה שהתגלה, לא נותרה למבקשת כל ברירה אחרת אלא לנקוט כנגד רון בהליכים משפטיים על דרך הגשת תביעה רכושית, בקשה להטלת עיקולים ובקשה לאיסור דיספוזיציה

ושמירת מסמכים שעניינה אי השמדת ראיות מושא נכסי בני הזוג השמורים בידי צדדים שלישיים - בקשות המוגשות בד בבד עם הגשת בקשה זו. אלא שמטבע הדברים, אין די בבקשות אלה, נוכח היקף ההסתרה והברחת הנכסים אל מחוץ לגבולות מדינת ישראל.

9. במצב דברים זה ועל מנת שיהא באפשרות המבקשת להבטיח ביצוע פסק הדין שינתן (לכשינתן) בתובענה הכספית-רכושית המוגשת בד בבד עם בקשה זו, ונוכח העובדה כי רון העביר נכסים רבים השייכים לבני הזוג מחוץ לישראל, ראוי ונכון שבית הדין הנכבד יגביל את המשיב משימוש בנכסי החוץ המוחזקים אצל המחזיקים - חברות ו/או יועצים ו/או נותני שירותים הקשורים בטבורם לרון ו/או מוסדות פיננסים בהם מוחזקים כספים אותם רון הסתיר - וכך תחסם בפני רון האפשרות להבריח מנכסים אלה המהווים חלק מהרכוש המשותף של בני הזוג.

10. **עוד לעניין זה נבהיר כבר עתה, כי כל אחד מהמחזיקים משמש כגורם מהותי בפעילותו הכלכלית של רון, באופן המקיים חזקה כי ברשותו כספים ו/או מניות ו/או כל זכות אחרת, כמפורט בבקשה זו וביתר הרחבה, בכתב התביעה ובבקשה להטלת עיקולים.**

11. עוד נחזור ונדגיש, כי נוכח התנהלותו הקלוקלת של רון, אשר משך שנים בחר להכמין מאשתו ואם ילדיו כספים וזכויות ממניעים של תאוות בצע גרידא, כמו גם לאור העובדה שמרכז חייו מחוץ לישראל והוא מתמחה בניהול כספים והעברתם ממקום למקום ברחבי העולם, **קיים חשש קרוב לוודאי, כי אילולא יינתן הצו המבוקש, יפעל רון להעלמת הכספים, המניות והזכויות המצויים בידי המחזיקים, באופן שיפגע אקוטית באפשרות ישראלה לממש את זכויותיה.**

<u>מנגד ברור, כי מתן הצו לא יכביד או יפגע בפעילות המשיב, שעה שכל המבוקש בשלב זה הינו, כי לא תבוצע כל פעולה על ידי רון בנכסי החוץ על מנת שלא ימשיך בדרכיו העקלקלות להעלמת והברחת נכסי חוץ אלו</u>.

בנסיבות אלו, לא יכול להיות בפי המשיב כל נימוק ממשי להתנגד לבקשה מוצדקת זו.

12. לפיכך, מתבקש בית הדין הנכבד ליתן את הסעדים הזמניים המפורטים ברישא לבקשה זו.

## ב. <u>הצדדים להליך</u>

13. **המבקשת**, גב׳ ישראלה שירה קליין בנצור, ילידת שנת 1967, הינה אזרחית ותושבת תל-אביב, ישראל .

14. **המשיב**, מר רון בנצור, הינו בעל אזרחות ישראלית המחזיק גם בדרכון אמריקאי. רון מכהן משך שנים במשרות ניהול בכירות בחברות ביו-מד שמרכזן בארה״ב (לרבות בתפקידי מנכ״ל) ומשכך מחלק את זמנו בין ישראל וארצות הברית, תוך שהוא שוהה חלק ניכר מימות השנה בארה״ב. כיום רון מועסק כמנכ״ל ודירקטור בחברת הביו-מד הציבורית Urogen Pharma Ltd. (להלן: **״חברת יורוג׳ין״**) .

15. בנוסף, מכהן רון גם כדירקטור בחברות הציבוריות Advance Inhalation Therapies Ltd. (להלן: **״חברת AIT״**) ו- Stemline Therapeutics Inc. (להלן: **״חברת סטליין״**).

16. **המחזיקות 1-9 הן חברות בתחום הפארמה-ביומד** (מרביתן - חברות ציבוריות הנסחרות בארץ ו/או בארה״ב) בהן כיהן ו/או מכהן רון במשרות בכירות (לרבות בתפקידי מנכ״ל ו/או כדירקטור) תוך הנאתו מתקבולים (לרבות הקצאת אופציות ומניות) בהיקפים של עשרות מיליוני דולרים.

17. **המחזיקים 10-12 מהווים קרנות ו/או חברות** בהן הושקעו על ידי בני הזוג מיליוני דולרים, בין במישרין ובין **באמצעות צדדים שלישיים וכן אנשים פרטיים האמונים ו/או קשורים לניהול נכסיהם ו/או הכנסותיהם של בני הזוג (אם במישרין ואם באמצעות תאגידים שבשליטתם ו/או בניהולם).**

18. **המחזיקים 12-31 הם מוסדות פיננסיים** אשר למיטב הידיעה מחזיקים בכספי בני הזוג, לרבות אחר שכספים מכספים שונים הועברו אליהם על ידי רון בנכלוליות וללא ידיעתה של ישראלה.

19. **המחזיקה 32, תקרן לירושלים (The Jerusalem Foundation), מחזיקה בבנק לאומי (אנגליה) בחשבון מס׳ 35815014 - חשבון אשר זכויות החתימה בו הינן אך ורק ע״ש רון אשר נרשם בחשבון זה כ׳רונלד בנצור׳ (!) בהתבסס על דרכונו הישראלי.**

## ג. <u>עיקרי העובדות הרלוונטיות לבקשה</u>

20. רון וישראלה אשר הכירו בישראל בשנת 1998, נישאו בתאריך 9.6.1999 כדמו״י (לעיל ולהלן: **״בני הזוג בנצור״**). במהלך חייהם המשותפים נולדו לבני הזוג בנצור שלושה ילדים: עמית יליד 27.5.2000 (להלן: **״עמית״**), נדב בנצור יליד 9.3.2002 (להלן: **״נדב״**) ואילון בנצור יליד 12.4.2007 (להלן: **״אילון״**). לעניין זה יצוין, כי שלושת ילדי הצדדים מאובחנים כבעלי צרכים מיוחדים, סובלים מהפרעות קשב וריכוז קשות, הפרעות שפה, חרדות ומבעיות בריאות רבות, כאשר הבן נדב אף מאובחן כאוטיסט.

21. בחלוף זמן קצר ממועד נישואיהם, החל רון לעבוד בחברת ביו-מד בשם Keryx Biopharmaceuticals Inc ישראל (להלן: **״חברת קריקס״**) - חברה בה עבד משך שנים ארוכות.

22. הן נוכח רצונו של רון בהשקעת מירב זמנו בפיתוח הקריירה המקצועית והן נוכח לידת עמית הוחלט כי ישראלה תעצור את התפתחותה המקצועית, תחדל מלעבוד ותתמקד בטיפול בבית בני הזוג.

23. הודות להשקעה משותפת זו, רון התקדם במהרה בסולם הדרגות בחברות ביו-מד שונות (ובפרט, בחברת קריקס), ומשכך, נוכח דרישתו וצורכי תפקידו, הוחלט כי בני הזוג יהגרו לניו ג׳רזי, ארה״ב עם ילדיהם.

24. לאחר מעבר בני הזוג בנצור לארה״ב, עבד רון כסמנכ״ל הכספים של חברת קריקס (ארה״ב), כיהן כמנכ״ל חברת XTL Biopharmaceuticals Ltd. (שהינה חברה ציבורית כיום) ואף מונה לימים למנכ״ל חברת קריקס - תפקיד אותו מילא בהצלחה עד למאי 2015 (אחר הנפקת החברה).

25. בד בבד עם ניהול חברת קריקס עסק רון במיזמים, ניהול וייעוץ לחברות שונות (בדגש על חברות בתחום הביו-מד), כמו גם ביצע השקעות מגוונות בפרויקטים שונים בסכומי עתק.

26. בעניין זה נציין, כי ככלל, במהלך החיים המשותפים רון ידע ושיתף את ישראלה אך ורק <u>בחלק</u> מהיקף השתכרותו הכולל, מקורות ההכנסה השונים שהיו למשפחה, פירות השקעות שבוצעו על ידו, המניות המוחזקות ברשותו, סוגי הנכסים שהיו ברשות בני הזוג ואופן ניהולם. זאת תוך שרון הציג בפני ישראלה מצג משל הם משתכרים סכומים נאים מאוד מידי שנה בשנה, המסתכמים במאות אלפי דולרים בלבד.

27. **אלא שכפי שיפורט להלן, בדיעבד הסתבר לישראלה (לרבות במסגרת חקירה כלכלית שנערכה על ידה בקשר עם היקף הכנסותיו של רון במרוצת השנים), כי רון הוליכה שולל, במשך כל חייהם המשותפים, ובפועל הרוויח מיליוני דולרים רבים נוספים אותם הסתיר והבריח, לרבות על דרך העברתם לחשבונות במדינות המהוות מקלטי מס ו/או העברתם לצדדים שלישיים והכל על מנת שאלו לא יהוו חלק מההון המשותף שיחולק בין בני הזוג.**

28. כך או אחרת, במרוצת החיים המשותפים של בני הזוג בנצור היו עליות ומורדות רבים - חלקם עקב אופיו המיוחד של רון אשר הקשה עד מאוד על חייה של ישראלה, לרבות עת רון התנהג באופן מחפיר שעה שסבל מהתקפי זעם ותסכול ונקט באלימות נפשית (לרבות מילולית) קשה כלפי ישראלה וחלקם עקב המתחים שנבעו מגידולם של שלושה ילדים בעלי צרכים מיוחדים.

29. בהמשך הדרך, נוכח החלטה משותפת של בני הזוג לשוב לישראל, שבו ישראלה וילדי בני הזוג לישראל באוגוסט 2014, תוך שהוסכם, כי רון ישוב לישראל עם סיום התקשרותו עם חברת קריקס, קרי - מספר חודשים בודדים אחר שובם של ישראלה והילדים לישראל.

30. במהלך שנת 2015 (ובפרט, במהלך מאי 2015) פעל רון למכירת מרבית המניות שהתקבלו לידיו הודות לעבודתו בחברת קריקס (אופציות ומניות שהפכו לסחירות אחר הנפקת החברה) תוך **שהתקבלו לידיו סכומי עתק העולים כדי לכל הפחות 20 מיליון דולר** (בשעתו ישראלה הכירה אך חלק מתקבולים עצומים אלו).

31. בהתאם להסכמה משותפת שהתגבשה בין בני הזוג בנצור, העבירו רון וישראלה במהלך שנת 2015 מיליוני דולרים מחשבונם בבנק TD (חשבון אליו העביר רון, על פניו, את מרבית תקבולי מכירת מניות קריקס) לחשבון משותף שנפתח על ידי ישראלה בבנק Chase, תוך שאלו הועברו לאחר מכן לחשבון בנק שנפתח ונוהל על ידי ישראלה בבנק הפועלים לישראל בע״מ, לשם רכישת בית מגורים בישראל.

32. בחלוף מספר חודשים אחר שוב רון לארץ, המליצו בעלי מקצוע לבני הזוג לשנות מהתנהלותם על דרך מעבר למגורים נפרדים בד בבד עם המשך חיים משותפים, וזאת במטרה להקטנת החיכוך בין רון, ישראלה וילדיהם.

33. בהתאם, במהלך ינואר 2016, ישראלה סייעה בידי רון באיתור, השכרה, ריהוט ואבזור דירה ברמת השרון אליה עבר רון להתגורר בשכירות על מנת לבצע הפרדה חלקית בלבד בינו ובין ילדי בני הזוג. כל זאת נעשה תוך שהצדדים הסכימו, כי בפועל יישארו לכל דבר ועניין בעל ואישה, תוך שהצעדים האמורים יסייעו בידי רון להקדיש מזמנו לטיפול בהתקפי הזעם והאלימות מהם סבל, כמו גם יקל נפשית על ילדיהם.

34. בהמשך, בחודש אפריל 2016, אחר שעלה בידי הצדדים לאתר בית מגורים מתאים בסיוע בעלי מקצוע מטעמו של רון ובסיועו הפעיל של רון, רכשה ישראלה בית פרטי ברחוב מגדל שורשן אשר בתל אביב (תוך שרון דאג לביצוע התשלומים עבור בית המגורים האמור) תוך שבית המגורים האמור נרשם על שם ישראלה, כך שישראלה וילדי בני הזוג החלו להתגורר בבית המגורים האמור באוגוסט 2016.

35. אלא שלצערם של הצדדים, הפרדת המגורים לא סייעה בהפחתת המתחים או האלימות, כי אם הגבירה את המחלוקות, עת רון איים לחטוף את הילדים ולהעבירם לארה״ב ובמקביל גרם לניכור הורי כנגד ישראלה.

36. כאשר הגיעו מים עד נפש, החליטו הצדדים לפנות להליכי גישור (לרבות בליווי עורכי דין ופסיכולוגים) בניסיון להגיע להסכמה הוגנת בדבר אופן פרידתם הכלכלית.

במסגרת זו, הצדדים הסכימו לפנות לעו״ד צביקה בר-נתן ממשרד גולדפרב זליגמן ושות׳ (לעיל ולהלן: **״עו״ד בר-נתן״**), על מנת שהלה יסייע בידיהם ויערוך בעבורם הסכם גירושין ויחסי ממון הוגן לעניין הפרדת וחלוקת הרכוש המשותף. יצוין, כי ברקע הליכי גישור אלה הוסיפו בני הזוג וקיימו הליכי גישור מקבילים גם בפני גבי ענת וקסמן-שופל וזאת במטרה להגיע לכדי הסכמה לעניין מכלול הסוגיות מושא ילדי בני הזוג.

37. עת החלו הצדדים לנהל מגעים בנוגע להיפרדותם, עלה בידי ישראלה לדחוק ברון לחשוף בפניה חלק (כבד יותר) מנכסי בני הזוג, תוך שרון ניאות ׳להוציא לאור׳ נכסים אשר אודות הימצאותם והיקפם הצביעה ישראלה באופן מפורש. **באופן זה רון הודה בפני ישראלה בקיומו של רכוש משותף ששוויו נאמד בסך כולל של כ- 14 מיליון דולר ארה״ב**. אלא שגם באותה עת, סירב רון להודות בקיום חלק מנכסי בני הזוג ואף סירב למסור לידי ישראלה מסמכים מהותיים אשר יאפשרו לה ללמוד אודות מלוא מצבת נכסיהם.

38. לעניין זה יצוין, כי עת פעלה ישראלה לאריזת בית המגורים המשותף בטנפלי, ניו ג׳רזי (כחלק מחזרת בני הזוג לישראל), ארגנה ישראלה גם את מסמכיהם השונים של בני הזוג (מטלה שממילא בוצעה כעניין שבשגרה על

ידי ישראלה). או אז, במהלך אחד מביקורה של ישראלה בארה"ב, גילתה ישראלה, כי בתא המטען של רכבם של בני הזוג אשר חנה בחניית ביתם של חברי בני הזוג (עקב השכרת בית המגורים לצדדים שלישיים וחזרת בני המשפחה לישראל) **רון הותיר מסמכים פיננסיים רבים**. ישראלה נטלה מסמכים אלו (בדומה למסמכים רבים וטובים שאופסנו על ידה) ושמרה אותם ברשותה, מבלי שעיינה בהם לעומקם ו/או הקדישה לבחינתם זמן רב.

39. במועד מאוחר יותר, עת הצדדים ניהלו מגעים בנוגע להיפרדותם, בחנה ישראלה מסמכים אלו - הן במישרין והן באמצעות בעלי מקצוע. בחינה זו העלתה, כי **קיימים חשבונות, הכנסות, מניות, השקעות וכיו"ב - אותם המשיך רון להסתיר מעיניה של ישראלה**.

40. עקב בחירתו זו של רון להמשיך ולהסתיר מישראלה את מצבת הנכסים המלאה של בני הזוג (לרבות על דרך הצגת היקף נכסים מוגבל, גם לאחר שישראלה אימתה את רון בעניין זה), כמו גם משעה שישראלה נותרה בתחושה עזה שרון עודנו מכמין מנכסיהם וכן מחמת שרון לא הסכים לשלם לידי ישראלה תשלומי מזונות אשר ישקפו נאמנה את צרכי ילדי בני הזוג, לא עלה בידי בני הזוג להגיע לכדי הסכם כולל.

## ד. **ישראלה גילתה לתדהמתה כי רון הסתיר ממנה נתח עצום מנכסיהם והכנסותיהם**

41. נוכח התנהלות רון ביצעה ישראלה חקירה כלכלית אודות הנכסים שצברו בני הזוג. **עת הוצגו בפני ישראלה הממצאים אומת חשדה הכבד והתחוור (חלק) מהיקף ההסתרה, ההכמנה והתרמית אשר עלו על כל דמיון**.

42. **כך נמצא, כי רון שיקר לישראלה, לכבוד המגשר ולבית הדין הרבני בבוטות, הבריח נכסים לרבות על דרך העברת כספים לקרובי משפחתו, רוקן חשבונות בנק ופתח בהיחבא חשבונות נוספים - הן באותם הבנקים בהם היו לבני הזוג חשבונות קיימים ופעילים על מנת לטשטש ולהסוות מעשיו הנכלוליים; והן במדינות אקזוטיות המשמשות כמקלטי מס**.

43. **בנוסף, לאחרונה התחוור לישראלה, כי רון אף רכש בהיחבא שתי דירות יוקרתיות ברמת השרון אותן רשם על שמו בלבד, והכול תוך שהוא הסתיר את דבר קיומן מישראלה; השמיט והעלים אותן (!) לחלוטין מרשימת נכסין אודותיהם הצהיר בתביעת הגירושין הכרוכה אשר הוגשה על ידו; ושיכן באחת מהן את המאהבת עימה הוא מתרועע בהיחבא מזה שנים ארוכות**.

44. **ואם האמור אינו חמור דיו, אזי מממצאי החקירה עלו בבירור כי לשם הסתרת והכמנת הנכסים כאמור, רון לא בחל בכל אמצעי ופעל בדרכים לא דרכים - לרבות ביצוע פעולות הטובלות באי חוקיות - ובכלל זה זיוף חתימתה של ישראלה על דיווחים לרשויות המס בארצות הברית (!) ומסירת דיווחים כוזבים אודות היקף הכנסותיו לרשויות המס בארצות הברית**.

45. להלן יפורטו **בתמצית** הנכסים, הזכויות, החשבונות, המניות וההכנסות השונות אשר הוסתרו במכוון על ידי רון ערב הפירוד, כפי שאלו ידועים לישראלה נכון למועד הגשת בקשה זו:

**45.1. כמפורט בהרחבה בבקשת העיקולים ובתביעה הרכושית המוגשת בד בבד עם בקשה זו, ישראלה גילתה, כי בנוסף לחשבונות הבנק וחשבונות ההשקעה אודותיהם סיפר (וגם הצהיר) רון, הוסתרו ממנה מספר רב של חשבונות בנק, בהם מוחזקים סכומי כסף עצומים:**

**45.1.1. חשבון מספר 927641503 ב- JP Morgan Chase ארה"ב (שאיננו אחד מהחשבונות אודותיהם סיפר רון לישראלה), בו מצויים כ- 5.052 מיליון דולר ארה"ב.**

**45.1.2. חשבון מספר 35815014 אשר בבנק לאומי (אנגליה) בו מוחזקים כ- 2.9 מיליון ליש"ט - חשבון שנרשם ע"ש 'קרן ירושלים', בעוד זכויות החתימה בחשבון הינן אך ורק על שם רון אשר נרשם**

<u>בחשבון זה כ׳רונלד בנצור׳ (!) אגב רישום דרכונו הישראלי</u>.

45.1.3. <u>חשבון בבנק מזרחי טפחות אשר בישראל, בו מוחזקים כ- 2 מיליון דולר</u>.

45.1.4. <u>חשבונות ב- UBS Investment Bank ארה"ב, בהם מוחזקים כ- 2.7 מיליון דולר</u>.

45.1.5. <u>חשבון ב- ASB Bank אשר בניו-זילנד, בו מוחזקים כ- 1.67 מיליון דולר ארה"ב</u>.

45.1.6. <u>חשבון בבנק RBC Capital Market אשר בבהאמס, בו מוחזקים כ- 1.2 מיליון דולר</u>.

45.1.7. <u>חשבון ב- RBC Capital Market ארה"ב, בו מוחזק כ- 1 מיליון דולר ארה"ב</u>.

45.1.8. <u>חשבון ב- ABN AMRO Securities LLC ארה"ב, בו מוחזק כ- 1 מיליון דולר ארה"ב</u>.

45.1.9. <u>חשבון בבנק לאומי (ארה"ב) בו מוחזקים כ- 815 אלף דולר ארה"ב</u>.

45.1.10. <u>חשבון ב- HSBC Bank בו מוחזקים כ- 650 אלף דולר ארה"ב</u>.

45.1.11. <u>חשבון ב- BNY Mellon ארה"ב, בו מוחזקים כ- 530 אלף דולר ארה"ב</u>.

45.1.12. <u>חשבון ב- Wells Fargo, בו מוחזקים כ- 436 אלף דולר (לעומת שווי אפסי מוצהר)</u>.

45.1.13. <u>חשבון ב- Bank of Ireland אשר באנגליה, בו מוחזקים כ- 300 אלף יורו</u>.

45.1.14. <u>חשבון ב- Santander Bank ארה"ב, בו מוחזקים כ- 200 אלף דולר ארה"ב</u>.

45.1.15. <u>חשבון ב- RBC Capital Market יפן, בו מוחזקים כ- 63 מיליון יין</u>.

45.2. ישראלה גילתה, כי רון העביר כספים מחשבונו בוולס פארגו (המשיבה 21) לחשבונות עלומים בבנק TD (המשיבה 17). כך, בחינה מדוקדקת של דפי חשבון בנק בוולס פארגו ממאי 2015 אשר אותרו על ידי ישראלה, כמו גם השוואתם לחשבונות הבנק המשותפים שניהלו בני הזוג בבנק TD העלתה, כי במסגרת חשבון הבנק בוולס פארגו החזיק רון במהלך שנת 2015 לא פחות מ- 20.7 מיליון דולר ארה"ב; כמו גם כי <u>במהלך המחצית הראשונה לשנת 2015, רון העביר מחשבון הבנק בוולס פארגו לא פחות מ- 3.76 מיליון דולר לחשבונות עלומים</u> (סך של 1,360,361 דולר ביום 6.5.2015; סך של 2,400,981 דולר ביום 7.5.2015).

לעניין זה יצוין, כי בנוסף להעברת הכספים לחשבונות הבנק העלומים ב- TD, העביר רון סכומים משמעותיים מאוד מוולס פארגו גם לחשבון בני הזוג בבנק TD וגם להשקעות שונות וביניהן - השקעה בסך 1.8 מיליון דולר באופנהיימר (המשיבה 22); השקעה בסך 2 מיליון דולר במריל לינץ׳ (המשיבה 20); והשקעה בסך 1 מיליון דולר בסאי-מיגסטון (המשיבה 10).

העתק תדפיסי חשבון הבנק בוולס פארגו לחודש מאי 2015 מצורף <u>נספח 1</u>.

45.3. רון טען בפני ישראלה במהלך השנה האחרונה, כי הוא מחזיק בחשבון בוולס פארגו שיתרתו שואפת לאפס. <u>אלא שהתברר, כי הלכה ולמעשה מצויים בחשבון כ- 500,000 דולר ארה"ב</u>.

45.4. לישראלה התחוור, כי במהלך פברואר 2018 רון רכש בהיחבא שתי דירות יוקרה ברחוב הבאר אשר ברמת השרון (גוש 6414, חלקה 147, יחידות מספר 31 ו- 39). למותר לציין, כי דירות יוקרה אלא לא נזכרו בתביעה שהגיש רון לבית נכבד זה (ובכלל). באחת מדירות אלה שיכן רון את פילגשו (עמליה);

ובאחרת את אחיו ובני ביתו, תוך שהוא מלין כי הוא נאלץ ל"הידחק" עם ילדי בני הזוג בדירה לה "רק" שלושה חדרי שינה.

העתק נסח מקרקעין המעיד על אחזקת רון בשתי דירות ברחוב הבאר ברמת השרון מצורף <u>כנספח 2</u>.

45.5. התחוור לישראלה - לרבות על דרך התכתבות (בהודעות טקסט) עם מר אלון אבן-חן - כי רון משך באופן חד צדדי ובהיחבא את מכלול הכספים שהשקיעו בני הזוג בקרן נדל"ן הידועה בשם 'אבן חן', בסך כולל של כ- 1,800,000 דולר ארה"ב, והעבירם לחשבון מספר 4348438626 המנוהל על שם רון בלבד בבנק TD(!).

ודוק; רון לא יידע את ישראלה אודות המשיכות האמורות; וממילא, לא קיבל את אישורה ולא העביר לידיה את חלקה בכספים משותפים אלה.

העתק הודעת הטקסט (SMS) ששלח מר אבן-חן לישראלה, בנוגע למשיכת הכספים כ- 1.16 מיליון דולר ארה"ב על ידי רון מצורף <u>כנספח 3</u>.

העתק תכתובת דואר אלקטרוני במסגרתה עדכן מר אבן-חן את ישראלה בדבר משיכת יתרת כספי ההשקעה באבן-חן על ידי רון מצורף <u>כנספח 4</u>.

45.6. ישראלה גילתה, כי רון העביר סכומי כסף נכבדים של בני הזוג לאחיו, מר אייל בנצור ומר דן בנצור.

העתק שקים שנמשכו מחשבונם של בני הזוג בנצור לפקודת אייל בנצור מצורף <u>כנספח 5</u>.

45.7. רון הסתיר מישראלה את דוחות המס שהוגשו על ידיו לרשויות המס בארה"ב. זאת על אף שמדובר בדוחות מס משותפים הכוללים, בין היתר, גם התייחסות לזכויותיה של ישראלה. רון אף הורה לרואי החשבון המטפלים בענייני המס השונים שלא להמציא לידי ישראלה את העתק הדוחות. <u>בדיעבד ועת התקבלו לידי ישראלה חלק מדוחות המס הרלוונטיים, התחוור לה, לתדהמתה, כי רון חתם על דיווחים שונים לרשויות המס גם בשמה של ישראלה תוך שהוא מזייף (כך ממש!) את חתימתה</u>.

העתק דוחות המס של רון על גביהם מתנוססת 'חתימתה' (המזויפת!) של ישראלה מצורף <u>כנספח 6</u>.

45.8. ישראלה גילתה, כי רון הסתיר חלק מהכנסותיו והגיש דוחות כוזבים לרשויות המס בארה"ב, תוך גריעת חלק מהתשואות ורווחי ההון שהופקו על ידיו במסגרת הדוחות הכספיים.

45.9. רון הסתיר מבית דין נכבד זה חלק ארי מהכנסותיו. כך, במסגרת כתב התביעה שהגיש רון לכבוד בית הדין הצהיר רון, כי הכנסותיו מסתכמות בהכנסה שוטפת המשולמת לידיו כמשכורת על ידי חברת יורוג'ן, תוך צירוף תלושי שכר מושא משכורותו.

בעשותו כן הכמין רון מבית הדין הנכבד את העובדה לפיה במקביל לכהונתו כמנכ"ל יורוג'ן, מכהן רון גם כדירקטור בחברות הציבוריות סטימליין ו- AIT, תוך שהוא מפיק הכנסות עתק נוספות מידי שנה.

בדומה, רון התעלם בתצהירו מההכנסות והזכויות שהתקבלו לידיו נוכח תפקידו (לרבות אופציות) וכן מהתקבולים המשולמים לידיו הודות לנכסים שנרכשו מהונם המשותף של בני הזוג.

העתק מכתב התביעה שהוגשה על ידי רון לבית דין נכבד זה מצורף <u>כנספח 7</u>.

45.10. קיים פער אדיר בין הצהרותיו של רון אודות רכושם של בני הזוג ובין הכנסותיו בפועל(!). ודוק; כאמור לעיל, במרוצת השנים (ובפרט, בעת האחרונה) טען רון באוזני ישראלה, כי במהלך חייהם המשותפים צברו הון משותף ששוויו מסתכם בכ- 14 מיליון דולר ארה"ב.

**<u>אלא שהן מהדוחות הכספיים שהגיש רון לרשויות המס בארה"ב והן ממסמך מרכז של המוסד לביטוח לאומי בארה"ב המציג את הכנסות בני הזוג בארה"ב עד לשנת 2015 עולה, כי הכנסותיו של רון לשנים 2003-2015 הסתכמו, נטו, בסך של 23.2 מיליון דולר ארה"ב.</u>**

**העתק דוחות כספיים של רון לשנים 2006, 2010, 2011, 2012, 2013 ו- 2014 מצורף <u>כנספח 8</u>.**

**העתק מסמך הכנסות מרכז רון מהמוסד לביטוח לאומי בארה"ב מצורף <u>כנספח 9</u>.**

לא למותר להדגיש, כי מטבע הדברים רון נהנה מהכנסה נכבדת (בישראל ובארה"ב) גם בטרם שנת 2003 (דוגמת הכנסה בסך כ- 225,000 דולר שהפיק רון במהלך שנת 1997) וכן, למיטב ידיעת ישראלה, רון הפיק הכנסה דומה ממשלח ידו גם במהלך השנים 2016 ו- 2017, **כך שבסך הכול רון הפיק במהלך השנים 2003-2017 הכנסה ממשלח יד וממכירת אופציות ממומשות בסך של כ- 25-26 מיליון דולר ארה"ב.**

**קרי, קיים חוסר מתאם בולט בין הכנסות רון (והתשואות שהפיק מהכנסותיו) ובין הנכסים אותם חשף בפני ישראלה.**

**45.11. רון פעל לריקון חשבונות הבנק המשותפים של בני הזוג. כך ובין היתר, במהלך אוקטובר 2017, עת ישראלה שהתה בחופשה משפחתית בתאילנד עם ילדי בני הזוג, ניצל רון שעת כושר זו על מנת לפעול לריקון חשבונותיהם המשותפים של בני הזוג בבנק הפועלים, CHASE ו- TD.**

**העתק תדפיס עו"ש חשבון הבנק המשותף של בני הזוג בנצור בבנק הפועלים מצורף <u>כנספח 10</u>.**

**העתק תדפיס עו"ש מחשבון הבנק המשותף ב- TD מצורף <u>כנספח 11</u>.**

**45.12. רון הפסיק להעביר את הכנסותיו (לרבות, משכורתו החודשית ותקבוליו כדירקטור) לחשבון הבנק המשותף של הצדדים, וזאת על מנת 'לייבש' את מקורותיה הכספיים הנזילים של ישראלה, ביודעו היטב, כי ישראלה נושאת בעיקר העלויות השוטפות הכרוכות בגידול הילדים; ומנגד, כי ישראלה אינה נהנית מהכנסה שוטפת כלשהי. למותר לציין, כי מנגד רון אינו נושא בתשלומי מזונות אישה ו/או ילדים. לעניין זה יצוין, כי מפעם לפעם, עת החשבון נקלע ליתרת חובה, רון מעביר סכומי כסף קטנים לשם סגירת יתרות החובה האמורות.**

**45.13. רון הוציא סכומי כסף נכבדים במשך שנים ארוכות על הנאותיו עם מאהבת בשם עמליה ווקסמן-אדלר עמה ניהל (ועודנו מנהל) רומן במקביל לנישואיו.**

**העתק תדפיס כרטיס אשראי אמריקן-אקספרס ע"ש רון המעיד על רכישת כרטיסי טיסה בעבורו ובעבור עמליה מצורף <u>כנספח 12</u>.**

**46. <u>השורה התחתונה פשוטה וחד משמעית: לישראלה התחוור לתדהמתה כי רון פשוט הוליך אותה שולל וגרע הימנה חלק נכבד מהנכסים שנצברו על ידי בני הזוג במהלך חייהם המשותפים, כמו גם כי הוא ממשיך לבצע פעולות לצורך הצרת צעדיה והכמנת חלקים מנכסי בני הזוג גם בימים אלו.</u>**

## ה. <u>המסגרת המשפטית: הבקשה עומדת בדרישות הדין למתן סעד של הגבלת שימוש בנכסים</u>

47. כידוע, תקנות קי"ח וקי"ט לתקנות הדיון בבתי-הדין הרבניים בישראל, התשנ"ג, קובעות כי בית הדין הנכבד מוסמך להוציא תחת ידיו צווי עיקול וצו מניעה זמניים במעמד צד אחד לשם הבטחת זכויות בנכסים שלגביהם הוגשה תביעה בבית-הדין או להבטחת זכויות לפי פסק-הדין.

48. כך גם סעיף 11 לחוק יחסי ממון בין בני זוג, תשל"ג-1973 (החל בענייננו מכוח סעיף 13 לחוק) קובע, כי בית הדין רשאי להוציא תחת ידיו צווים לשם שמירת זכויות הצדדים כמו גם על מנת למנוע ניסיונות צד לבצע פעולות חד צדדיות אשר עלולות לסכל הסדר איזון משאבים.

49. בהתאמה (וכמקבילה לתקנה 383 לתקנות סדר הדין האזרחי) קמה לבית הדין הסמכות ליתן סעד זמני המגביל את שימושו של בעל דין בנכס - ללא הגבלה על מקום הימצאות הנכס - לרבות מחוץ לתחום המדינה, וזאת תוך עיגון הסעד המכונה 'צו מרווה', שמקורו במשפטי האנגלי, בשינויים המחויבים.

50. כידוע, הצו נועד 'להקפיא' ולמנוע שימוש, באופן זמני, בנכסים הדרושים כדי להבטיח קיומו של פסק דין שניתן או שיינתן (ראה רע"א 4556/03 **בנק סטנדרט צ'רטר נ' קטב**, פ"ד נז(6) 1 (2003) (להלן: **"עניין בנק סטנדרט צ'רטר"**).

51. לעניין זה יצוין, כי תקנה 383 מצויה בגדרי פרק כ"ח לתקנות שעניינו עיקולים זמניים וזאת חרף העובדה שהסעד המפורט בגדרי התקנה אינו מהווה סעד של "עיקול זמני" במובנו הרגיל, עת יש בו כדי לשלב יסודות מדיני העיקול עם יסודות מדיני צו המניעה (ראה אורי גורן, **סוגיות בסדר דין אזרחי** (מהדורה 12, 2015), עמוד 939).

52. עוד יצוין, כי בהתאם להוראות תקנה 383, 'צו המרווה' הינו צו אישי in personam - קרי, אכיפתו נעשית כנגד המשיב עצמו ולא כנגד הנכס. בהתאם, אין חשיבות לשאלת מיקום הנכס ולסיווגו, עת נמען הצו הוא האדם הכפוף לסמכות השיפוט (עניין בנק סטנדרט צ'רטר לעיל).

53. אשר על כן, תקנות ק"ח וק"ט, בצירוף סעיף 11 לחוק יחסי ממון (ובהקבלה, גם תקנות 362 ו- 383 לתקנות) מסמיכות את בית הדין הנכבד ליתן 'צו מרווה' המגביל את השימוש בנכסי המשיב, לרבות שימושו בנכסים המצויים מחוץ לתחום שיפוטו של בית הדין הנכבד, כמבוקש בגדרי בקשה זו, בהתקיים התנאים המצטברים הבאים: (1) בעל הדין כלפיו מכוון הצו להגבלת שימוש בנכסים (רון) כפוף לסמכות השיפוט של בית הדין; (2) הבקשה נתמכת בראיות מהימנות לכאורה לקיומן של עילות התביעה; (3) הבקשה נתמכת בראיות מהימנות לכאורה המצביעות על חשש סביר, כי אי מתן הצו יכביד באופן ממשי על ביצוע פסק הדין לכשיינתן לטובת ישראלה; (4) מאזן הנוחות נוטה לטובת הצד מבקש הסעד (ישראלה); (5) הבקשה הוגשה בתום לב ומתן הסעד צודק וראוי בנסיבות העניין, ואינו פוגע במידה העולה על הנדרש.

54. והנה, כפי שפורט לעיל ויבואר להלן, בקשה זו עומדת **בכל** התנאים המצטברים המנויים להטלת צו על רון להגבלת השימוש בנכסיו, כפי שהתבקש ברישא לבקשה.

**<u>ה.1. רון כפוף לסמכות השיפוט של בית הדין הנכבד</u>**

55. כאמור, תנאי מקדמי למתן צו להגבלת שימוש הינו כי בעל הדין כלפיו מכוון הצו כפוף לסמכות שיפוט בית הדין. לענייננו, רון, בעל הדין כלפיו מכוון הצו, הינו אזרח ישראלי הכפוף לסמכות בית הדין הנכבד.

**<u>ה.2. התובענה נתמכת בראיות מהימנות המקימות זכות לכאורה</u>**

56. כידוע, ההלכה קובעת, כי בשים לב לכך שהבקשה מוגשת בשלב דיוני מקדמי, **אין** צורך בהוכחה מלאה של כלל רכיבי התביעה, אלא די בהוכחה כי לא מדובר בתביעה טורדנית או משוללת יסוד. ובלשון השופט אורי גורן, בספרו **סוגיות בסדר דין אזרחי** (מהדורה 12, 2015), בעמוד 863:

> **"השאלה הראשונה שיש לדון בה בבקשה לסעד זמני נוגעת לטיב התביעה ולסיכוייה. די בכך שהוכח שהתביעה אינה טורדנית ושקיימת שאלה רצינית שיש לדון בה. בשלב זה אין צורך לפסוק באורח סופי בדבר צדקתו של מי מבעלי הדין"**

וראה גם: ע״א 2501/05 **אילן ששון נ׳ כרמל איגוד למשכנתאות והשקעות בע״מ** (פורסם בנבו, 18.04.2005); רע״א 7139/96 **ליאניד טריגוב נ׳ ״טפחות״ בנק למשכנתאות לישראל בע״מ**, נא(2) 661 (1997); ת״א (כלכלית) 42697-01-14 **אגם הוצאה לאור בע״מ נ׳ ישראל מזרחי** (פורסם בנבו, 19.03.2015); תמ״ש (משפחה תל אביב-יפו) 14546-01-10 **פלונית נ׳ אלמוני** (פורסם בנבו, 17.06.2010)

57. __ובהתאמה, נוכח שפע הממצאים המוצגים לעיל, ברור כי במקרה שלפנינו ישראלה הציגה שפע ראיות מהימנות לכאורה לקיומן של עילות תביעה, המעידות על כך כי רון הסתיר הימנה רכוש משותף בשווי מוערך של עשרות מיליוני דולרים וכי סיכוי תביעתה גבוהים ביותר.__

## __ה.3. ראיות מהימנות לכאורה לקיומו של חשש סביר, כי אי מתן הצו עלול להכביד באופן ממשי על ביצוע פסק הדין__

58. הדין מוסיף וקובע, כי על המבקש הגבלת השימוש בנכסים להוכיח כי קיים **חשש סביר** שאי מתן הצו עלול **להכביד** באופן ממשי על ביצוע פסק הדין (ובלשון תקנה 383 לתקנות: "...**ראיות מהימנות לכאורה לקיומו של __חשש סביר__ שאי מתן הצו יכביד באופן ממשי על ביצוע פסק הדין**").

59. כידוע, במסגרת יסוד ההכבדה יש לבחון את מצבת הנכסים המצויה בתחומי השיפוט ואת החשש שמא יתקשה הזוכה בסעד לממש את הסעדים שיוענקו לו. כך ובין היתר, מקום בו אין די נכסים בתחום השיפוט על מנת להבטיח את ביצועו של פסק הדין לכשיינתן, ישנו בסיס להטלת הצו להגבלת שימוש בנכסים (וראה עניין בנק סטנדרט צ׳רטר).

60. ובהתאמה לענייננו, מאחר ושווי הנכסים ברי האיזון המצויים בתחום השיפוט של מדינת ישראל נמוך בהרבה ממחצית שווי נכסי בני הזוג (ועל אחת כמה וכמה - משווי הנכסים להם זכאית ישראלה נוכח הצורך בתשלומי איזון) ומנגד מרבית נכסי בני הזוג בנצור מצויים מחוץ לתחום השיפוט של מדינת ישראל, אזי ברור, כי אי מתן הצו יכביד באופן ממשי על ביצוע פסק הדין.

61. זאת ועוד. ההלכה בעניין עיקולים זמניים (אשר על פניו יש להחילה גם לעניין צו הגבלת שימוש בנכסים) קובעת, כי כאשר מיוחס למשיב לבקשת עיקולים דפוס התנהגות של **מרמה והונאה**, קיימת חזקה בדבר קיום חשש להכבדה על ביצוע פסק הדין, אם לא יינתן העיקול הזמני. וראה בש״א (חיפה) 4961/98 **שלום אוחנה נ׳ יוסף מזור** (פורסם בנבו, מיום 2.12.1998) (הלכה אשר אומצה על ידי בית המשפט העליון במסגרת רע״א 228/99 **שלום אוחנה נ׳ יוסף מזור** (פורסם בנבו, מיום 15.3.1999)):

> **"חזקה היא, חזקה הנובעת מניסיון החיים והשכל הישר, שמקום שהוכח, כי הנתבע רימה, לכאורה... והוליך את בעל חוזהו בכחש, הרי שאם לא יובטח, כי נכסים מסוימים של הנתבע יעוקלו כדי לאפשר לתובע (הצד המרומה) לממש מתוכם את פסק הדין שינתן לזכותו, אם יינתן, יקשה על התובע לבצע את פסק הדין. זאת, משום החשש שכפי שהנתבע הוליך את התובע בכחש לגופה של עילת התביעה, כך לכאורה, יעשה הנתבע להכביד על התובע לכשיבוא לבצע את פסק הדין."**

62. עוד ראה בעניין זה בש״א (ת״א) 3810/07 **עו״ד עמי רוזנברג נ׳ בנק דיסקונט לישראל בע״מ** (פורסם בנבו, מיום 27.3.2007) (להלן: "**עניין רוזנברג**"), עמוד 13 להחלטה:

> **"עסקינן בטענות חמורות המיוחסות למבקש מסוג תרמית, אשר קבעתי כי הן נתמכות בראיות מהימנות לכאורה. טענות אלו, בנסיבות האמורות, מבססות הצורך בהטלת עיקול זמני...".**

63. וראה גם: תמ"ש (משפחה תל אביב-יפו) 5511-05-10 **פלונית נ' אלמוני** (פורסם בנבו, 15.08.2010):

**"המשיב העדיף לפעול חד צדדית ולהעביר מיליון דולר לחשבון בנק רק על שמו. בהתנהגותו זו יש די להוכחת חשש הכבדה."**

64. ובהתאמה לענייננו: כפי שבואר לעיל בהרחבה, בענייננו הוצגו ראיות חד משמעיות המלמדות על כך שרון אשר מרכז חייו העסקיים מחוץ לגבולות ישראל, פעל בחוסר תום לב קיצוני עת הסתיר, בכוונת מכוון ובמרמה, נכסים וכספים שהיו שייכים לתא המשפחתי. זאת עשה רון, על מנת לנסות ולגזול מישראלה את חלקה בנכסי בני הזוג. בנסיבות אלה ונוכח משקלן הדרמטי של שפע האינדיקציות המלמדות על ניסיונותיו של רון לטשטש את עקבותיו, להכמין את נכסיו ולהקשות באיתורו ובתפיסת נכסיו - לא יכול להיות חולק כי הכף נוטה משמעותית לטובת מתן הצו המבוקש.

65. כך גם בנסיבות דנן ברור, כי קיים חשש של ממש (נקוט לשון המעטה), כי אילולא יוטל צו הגבלת השימוש, עלולה ישראלה למצוא עצמה ניצבת בפני שוקת שבורה, עת תבקש לאכוף את פסק הדין אשר לבטח יינתן לטובתה, שעה שאלמלא הצו יוכל רון לפעול בנקל על מנת להעלים ולהסתיר את הכספים והנכסים המוחזקים מחוץ לגבולות ישראל.

## __ה.4. מאזן הנוחות נוטה לטובת ישראלה__

66. כידוע, ההלכה קובעת, כי במסגרת בחינת מאזן הנוחות יש לבחון את הנזק שייגרם למבקש כתוצאה מאי מתן הצו, אם וככל וההליך יוכרע לטובתו, אל מול הנזק שייגרם למשיב כתוצאה ממתן הצו, אם וככל וההליך יוכרע לטובתו.

67. מעבר לחשש (הממשי) פן רון יעשה כל אשר על ידו כדי להכביד על ביצוע פסק הדין בתביעה שהגישה ישראלה (לכשיינתן), __נדגיש כי הנזק הצפוי לישראלה מאי מתן הסעד המבוקש עולה בהרבה על הנזק שייגרם לרון, אם יינתן הסעד המבוקש__.

68. ודוק, הנזק הצפוי לרון מהיעתרות לבקשה להגבלת השימוש בנכסים **מסתכם בהקפאת המצב הקיים, עת עסקינן בצו אישי האוסר לעשות דיספוזיציה בנכסים**. כך, ערכם של הנכסים לא יפחת ולא ייפגע; ולמותר לציין, כי אם תדחה התביעה יפוג תוקפו של הצו.

69. הדברים נכונים בחזקת קל וחומר עת ברור, כי ברשות רון נמצא הון עתק והוא אף מוסיף ומפיק הכנסות אדירות מידי יום ביומו, ומשכך - הגבלת השימוש בנכסים לא תכביד בפועל על התנהלותו השוטפת. אלא שהון עתק זה מוחזק, רובו ככולו, מחוץ לגבולות מדינת ישראל (לרבות, במקלטי מס), ומשכך נדרשת הגבלת השימוש בנכסים על מנת להבטיח את זכויות ישראלה.

70. לצד ובנוסף לזאת ברור - בין היתר נוכח התנהלותו של רון, כי ישראלה לא תזכה לשיתוף פעולה' כל שהוא מרון; וכי למעשה, יש להניח (בסבירות גבוהה לוודאית), כי עת יוודא לרון אודות ההליכים שננקטו נגדו על ידי ישראלה, יעשה רון כל שביכולתו על מנת להוסיף ולהכמין מנכסיו וחשבונותיו, לרבות על דרך העברתם לחשבונות עלומים במקומות רחוקים מן העין, תוך הכמנת ו/או השמדת כל בדל ראיה לקיומם של נכסים אלו והעמדת ישראלה בפני שוקת שבורה. ובהתאמה, הנזק הצפוי לישראלה מאי היענות לבקשה עצום ביותר ולמעשה בלתי הפיך.

## __ה.5. הבקשה הוגשה בתום לב, מתן הסעד צודק ואינו פוגע במידה העולה על הנדרש__

71. ישראלה הציגה בפני בית הדין הנכבד את התמונה המלאה מושא תביעתה כנגד רון, כפי שזו ידועה לישראלה בשלב זה, ולא הסתירה דבר. כך גם ישראלה סמוכה ובטוחה, כי הוצגו בפני בית הדין הנכבד כל הנתונים

הנחוצים לצורך מתן החלטה בבקשה כאן.

72. לא זו גם זו. בקשה זו הוגשה בתום לב, רק לאחר שהתחוור לישראלה כי רון רימה אותה באופן שיטתי, סדרתי ומתוחכם המעיד על כוונותיו הברורות להסתיר ממנה נכסים כספים בהיקפים גבוהים, כמו גם לאחר שעלה בידי ישראלה לאסוף ראיות אודות הכמנת הנכסים באמצעות חקירה כלכלית מעמיקה.

73. מנגד, הבקשה אינה פוגעת ברון במידה העולה על הנדרש, לאור העובדה שמדובר בעיקר בהטלת צו זמני להגבלת שימוש בנכסים על נכסים וכספים של רון בחו״ל - בקשה אשר אין בה כדי לפגוע בערך הנכסים, כך שלא יגרמו לרון נזקים של ממש; ובוודאי שלא יגרם לו נזק אשר ישתווה לנזק שיגרם לישראלה אילולא יוטל הצו להגבלת השימוש בנכסים.

74. עוד נוסיף ונדגיש, כי ישראלה נקטה בכל האמצעים העומדים לרשותה בכדי לשמור הן על זכויותיה והן על התא המשפחתי, תוך שהיא פעלה רבות - הן במישרין והן באמצעות באי כוחה - על מנת להביא להסדרת העניין מחוץ לכותלי בית הדין, אך זאת ללא הועיל. במצב דברים זה ברור, כי ישראלה פועלת בתום לב; כי נקטה בכל הצעדים העומדים לרשותה בטרם פניה לערכאות; וכי הצווים המבוקשים על ידיה מידתיים.

## ו. סוף דבר

75. לאור כל האמור לעיל, מתבקש בית הדין הנכבד ליתן, במעמד צד אחד, צו להגבלת שימוש בנכסי החוץ כמבוקש ברישא לבקשה וכן לחייב את רון בהוצאות הבקשה, לרבות שכ״ט עו״ד.

76. יהא זה מן הדין ומן הצדק להיעתר לבקשה.

לורי גייזלר, עורכת דין | ספי ריבה, עורך דין

ב״כ גב׳ ישראלה שירה קליין בנצור